

CLERK
US DISTRICT ... WHO?CY

2009 FEB 19 PM 6: 11

RECEIVED

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

FEB 1 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| JACQUELINE T. ROBINSON-REEDER | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) |
| AMERICAN COUNCIL ON EDUCATION | ) |
| | ) |
| Defendant | ) |
| | ) |

Civil Case: 07-0880 (JDB)

## AMENDED COMPLAINT TO DEFAMATION CLAIM

Plaintiff amends Title VII complaint against the American Council on Education filed on May 10, 2007, to show diversity jurisdiction under Title 28, U.S.C § 1332. This is a claim for defamation and [1]defamation per se and the plaintiff is entitled to relief. This court has jurisdiction over this claim because the plaintiff is a resident of Maryland and the defendant is a not profit corporation incorporated in and with its principal place of business located in the District of Columbia.

The amount in controversy exceeds $75,000.00. Thus, there is diversity jurisdiction under 28 U.S.C. section code 1332 for the plaintiff who is entitled to relief to gain permanent employment. This court has supplemental jurisdiction over the claim "Defamation" under Title VII of the Civil Rights Act of 1964, 28 U.S.C. Sections 1331 and 1337. The plaintiff is protected under Title VII, Sec. 2000e-2 (Section 703).

The defendant repeatedly informed potential employers that plaintiff was "rude and unprofessional, filed an "EEOC "case and was "fired." The plaintiff has suffered mental anguish and stress by failing to find permanent employment after slandered reputation by the

---

[1] Defamation per se provides a significant exception to that rule: Typically, where the statements made by the defendant constitute defamation per se, the *defendant* has the burden of proving that the allegations are true. Typically, the following may constitute defamation per se: Attacks on a person's professional character or standing;
Remember, if the statement is one that is defamatory *per se*, the plaintiff does not have to prove any special damage. In such a case, the plaintiff is entitled to recover general damages, which include harm to reputation, without evidence of the harm incurred. Even where the defamation is actionable *per se*, the plaintiff may recover "special damages" over and above general damages, if he or she pleads and proves that the defamatory statement was a substantial factor in causing that harm. Such special damage may include an inability to obtain employment.

1

defendant. *Attachment (1) failed stress test, 3-day admittance to Doctors Community Hospital, and femoral artery catheterization procedure to determine Unstable Angina at Washington Adventist Hospital. Plaintiff was diagnosed with "stressful" condition.*

Plaintiff had a stellar reputation with excellent job references before employment at the American Council of Education. Defendant [2]retaliated against plaintiff by denying job references and repeatedly informed potential employers that she was "rude and unprofessional" after she filed her EEOC complaint in December 2006. *Attachment (A) NLC job reference*

> Plaintiff deserves a "jury trial" based on -- **In ruling on a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and accept as true all well-pleaded allegations of fact. Cowell v. Palmer Township, 263 F. The court must determine whether "under any reasonable reading of the pleadings, plaintiff may be entitled to relief." Nami v. Fauver, 82 F.**

Plaintiff seeks relief from the defendant injuring her career by informing potential employers that the plaintiff was "**fired**," filed an **EEOC complaint** and that she is "**rude and unprofessional**."

Employment Law defining Defamation per se

If the statement is one that is defamatory per se, the plaintiff does not need to prove any special damage. In such a case, the plaintiff is entitled to recover general damages, which include harm to reputation, without evidence of the harm incurred. Even where the defamation is actionable per se, the plaintiff may recover "special damages" over and above general damages, if he or she pleads and proves that the defamatory statement was a substantial factor in causing that harm. **Such special damage may include an inability to obtain employment.**

Plaintiff seeks relief in gaining [3] a standard job reference verifying dates of employment, salary, title and status. The American Council on Education has basked in their violation of Title VII, of the Civil rights Act of 1964, 42 U.S.C. 2000e-3 (a) to deny a "standard" job reference for the ex-employee to gain employment starting in November 2006, and continuing on January 9, 2007, June 1 2007, June 25 2007, November 19, 2007, and January 4, 2008. Defendant has denied a standard job reference, but offered "an apology" letter

---

[2] **Employment Law: Privacy Rights of Employees:** With regard to job references, employers may not communicate false information to prospective employers without possibly being subject to a lawsuit for character defamation. Employers are also prohibited from communicating certain other types of information about a former employee without the express consent of the employee. **Discrimination/Retaliation:** Providing an adverse employment reference or refusing to provide a reference for discriminatory reasons or in retaliation for filing an EEOC charge is a violation of Title VII. Although Title VII and similar state laws typically protect only "employees" from discrimination and retaliation, courts have been willing to extend their protection to former employees in this context. *See, e.g., Robinson v. Shell Oil,* 519 US 337, 346 (1997) (holding that 42 USC 2000e-3(a), which makes it unlawful for an employer to discriminate against employees who have availed themselves of protections under Title VII, is applicable to former employees). **Blacklisting:** Historically, blacklisting laws were used to prevent employers from providing bad job references in retaliation for a former employee's participation in union-related activity. However, blacklisting laws are generally broad enough to cover any communications designed to prevent former employees from securing employment

[3]  38 Hashimoto, 118 F.3d at 676. See also EEOC v. L. B. Foster, 123 F.3d at 754 n.4 (plaintiff need not prove that retaliatory denial of job reference caused prospective employer to reject her; such a showing is relevant only to damages, not liability); Smith v. Secretary of Navy, 659 F.2d 1113, 1120 (D.C. Cir. 1981) ("the questions of statutory violation and appropriate statutory remedy are conceptually distinct. An illegal act of discrimination -- whether based on race or some other factor such as a motive of reprisal -- is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [damages]").

instead. *Attachment 2 – Court appointed attorney asked defendant for a standard job reference before mediation. Request was ignored and denied by defendant.*

Plaintiff seeks relief in having the defendant remove all negative employment data referencing employee on computer based reference checked internet sites by potential employers.

Plaintiff seeks relief to gain permanent employment at same salary of $27.00 per hour before American Council on Education's retaliation.  In receiving the slandering of reputation, the plaintiff has only been offered jobs earning $12.00 – 17.00 per hour.  *Attachment (B) paychecks*

Plaintiff has direct evidence that defendant has informed potential employers that an "EEOC charge was filed and that she is "rude and unprofessional" and defendant was "fired."   Plaintiff submitted letter of resignation on November 6, 2006.

**Therefore, with the previous motion filed on January 4, 2008, the plaintiff asks the court to recognize that The American Council on Education failed to properly [4]investigate allegations from unidentified employees at another location other than plaintiffs work.  Those allegations of "rude and unprofessional" are in writing and has been told to a third party.  The American Council on Education has apologized for not doing an investigation.**

**The American Council on Education has abused their qualified privilege by a reckless act, which shows a disregard for the plaintiff's rights, including the failure to properly investigate the truth of the matter and by informing potential employers that plaintiff filed "EEOC charge."**

Plaintiff has [5]circumstantial and direct evidence that beginning  November 7, 2006, defendant informed NRI, temporary agency, George Washington University, World Bank, Ford Agency, Graham Staffing, Omni Sheraton Hotel and TIAA-CREF that ex-employee filed [6]EEOC charge and was fired for being "rude and

---

[4] **Employee right – Defamation:** The employee may press charges of defamation when he ex-employer provides discriminatory job references to prospective employers, which may cause harm to the employee.  In an employment setting, if the employee is wrongfully accused of misconduct in writing, the employee has a valid reason to file charges of defamation against the employer or the accuser.  In case the employer does not investigate the defamatory remark (s) fairly, both the employer and the accuser are held accountable.

[5] On behalf of a unanimous U.S. Supreme Court, Justice Thomas declared, "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." The Court ruled that the judgment for Costa would stand even though the only evidence she had to support her claims was that she was punished more severely than her male coworker for the same fight, she was not assigned overtime as frequently as male employees and the company often tolerated sex-based slurs against her. Desert Palace, Inc. v. Costa, 537 U.S. 1009 (6/9/03).

[6] Some employers have retaliated against former employees who have filed civil rights discrimination claims by giving prospective employers negative references and advising them of the fact of EEOC filing. Although some earlier cases refused to recognize post-employment blacklisting or

unprofessional' defaming the plaintiff, while she "resigned." The plaintiff was verbally informed by several potential employers that an [7] "unfavorable reference was given." for reasons of non-hire and denied evidence. Plaintiff tried to secure personnel files from agencies after reading D.C. law on December 27, 2007. Files were refused and references removed to prevent liability after denying employment because of knowledge of plaintiff's EEOC charge. See attachment (4) *D.C. law*

The defendant has used this slanderous title "rude and unprofessional" to inform potential employers while giving negative job references causing the ex-employee to be unemployed in a permanent job to date as of February 18, 2008. Defendant has admitted to giving references that attributed to the non-hiring of the plaintiff after her resume was selected and interview conducted. Attachment (D). *Declaration.* Although the defendant categorizes the reference as "favorable" the decision the potential employer made not to hire the plaintiff after speaking to Colleen Collins proves that her reference made more harm than good. Plaintiff was not hired.

The plaintiff filed motion **"PRELIMINARY INJUNCTIVE RELIEF TO HALT IRREPARABLE HARM"** on January 18, 2007, that gives the court the history of the defamation claim in detail. The plaintiff will not inflict the same reading in the amended complaint to ease the reading for Judge Bates. However, the plaintiff will pray that Judge Bates allow the plaintiff the right to a Jury Trial, by the noted: <u>**In ruling on a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and accept as true all well-pleaded allegations of fact. Cowell v. Palmer Township, 263 F. The court must determine whether "under any reasonable reading of the pleadings, plaintiff may be entitled to relief." Nami v. Fauver, 82 F**</u>

The defendant neglected to provide and ensure COBRA notices for election due to constructive discharge on November 7, 2007, and kicked plaintiff off property without visit to Human Resources to sign papers for employees that resign. COBRA notifications **were never mailed**. The pro se plaintiff has suffered for over three hundred and sixty five days at the malicious behavior of the defendant with no relief from the EEOC or the court. Plaintiff has been unemployed and has applied for Social Services (welfare assistance). Plaintiff

---

negative references given to prospective employers as a cognizable claim under Title VII. - most later cases regarded such claims as consistent with the rights protected under Title VII.

[7] Title VII prohibits discrimination against a current employee, former employee, or applicant because he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII,@ 42 U.S.C. '2000e(e)(3)(a).

Title VII also prohibits discrimination against a current or former employee or applicant because he has opposed any practice made in unlawful practice by Title VII,@ 42 U.S.C. '2000e-3(a) the courts have held that an employee is protected if he or she had a reasonable and good faith belief that the practice they opposed constituted a Title VII violation even if it turned out that the practice they opposed was not a violation of Title VII, Dee v. Colt Construction and Delivery Company, 28 F.3d 1446 (7th Cir.)(1994).

was granted food stamps, Plaintiff has exhausted all unemployment benefits. Plaintiff is blacklisted and potential employers fear to hire her because previous employer constantly informs them that I filed an "EEOC" case. The defendant constantly informs employers that 'plaintiff is rude and unprofessional" Plaintiff has direct evidence that defendant has [8]retaliated by denying a [9] "standard" job reference.

## Memorandum of Facts

Defendant's H.R. director admits to giving a reference. However, this reference did not gain the employment of the plaintiff. This situation directly proves that the potential employer was interested in hiring the plaintiff, but after contacting the H.R. director did not [10]hire the plaintiff despite her non-admittance of slandering. Plaintiff is still unemployed permanently. See declaration by Collins. (Attachment D)

The defendant has repeated that the plaintiff is "rude and unprofessional" every time a potential employer has inquired about the ex-employee. Plaintiff has direct and circumstantial evidence that defendant is violating her rights under defamation and [11]defamation per se. Therefore, the plaintiff request [12]injunctive relief from slandering of reputation.

Defendant has denied the plaintiff a job reference as retaliation and adverse action in their Answer statement defense on June 1, 2006, written under Answer no. 9. The written job reference would eliminate the

---

[8]    Retaliatory acts designed to interfere with an individual's prospects for employment are unlawful regardless of whether they cause a prospective employer to refrain from hiring the individual\34. As the Third Circuit stated, "an employer who retaliates cannot escape liability merely because the retaliation falls short of its intended result."\35 However, the fact that the reference did not affect the individual's job prospects may affect the relief that is due.

[9]    38 Hashimoto, 118 F.3d at 676. See also EEOC v. L. B. Foster, 123 F.3d at 754 n.4 (plaintiff need not prove that retaliatory denial of job reference caused prospective employer to reject her; such a showing is relevant only to damages, not liability); Smith v. Secretary of Navy, 659 F.2d 1113, 1120 (D.C. Cir. 1981) ("the questions of statutory violation and appropriate statutory remedy are conceptually distinct. An illegal act of discrimination -- whether based on race or some other factor such as a motive of reprisal -- is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [damages]").

[10]   Section 706(g) empowers the court to order declaratory relief, injunctive relief such as reinstatement or hiring of employees with or without back pay, or "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g). In addition, Section 102 of the Civil Rights Act of 1991 now permits courts, in an appropriate case, to award compensatory and punitive damages for violations of Sections 703 and 704 of Title VII. 42 U.S.C.A. § 1981a (1994). This most recent expansion of the courts' remedial powers addresses a major concern in Polsby -- that appropriate relief would be difficult or impossible to fashion for former employees who, typically, obtain another job despite the best (or worst) efforts of a previous employer.

[11]   Defamation per se: All states except Arizona, Arkansas, Mississippi, Missouri, and Tennessee recognize that some categories of statements are considered to be defamatory per se, such that people making a defamation claim for these statements do not need to prove that the statement was defamatory. In the common law tradition, damages for such statements are presumed and do not have to be proven. Traditionally, these per se defamatory statements include: Allegations or imputations "injurious to another in their trade, business, or profession"

[12]   Title VII of the Civil Rights Act of 1964 - An Act: To enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations, to authorize the attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Civil Rights Act of 1964".

interference of receiving negative references based on the probation letter stating "rude and unprofessional" behavior. The written job reference would be hand delivered on interviews and attached online when applying for a job. This would eliminate the stress of going on job interviews only to have the defendant slander my name and therefore being refused a job that qualify for.

The plaintiff is getting pass the resume search to the interview process, which is a great accomplishment in obtaining a job. The last process of checking references with previous employers can make or break the job offer. The American Council on Education hired the plaintiff because the job reference checked with previous employer was great enough for permanent job offer.

The job reference requested is a "standard" job reference verifying, title, salary, dates of employment, etc. If the defendant is not trying to ruin the career of the plaintiff and seeks peace, then why not settle this struggle for the plaintiff if not for some evil deed? The plaintiff has been without a salary since her constructive discharge and the defendant is not doing anything to improve the conditions of her inability to gain income. Is this there normal behavior towards an ex-employee? If the defendant does not have a ill will towards the plaintiff, why the denial for such a length of time?

Without the court's relief, the defendant's behavior that started in November 2006, and has continued until January 2008, is proven to cause the plaintiff irreparable financial harm by unemployment is [13]retaliation. Plaintiff has survived interviews with high interest but refused employment after reference check due to the slander and malicious behavior to prevent employment by scaring off potential employers that plaintiff filed an "EEOC" charge.

It has been very [14]hard to gain written evidence of this behavior because potential employers do not want to be involved in a civil complaint, although some individuals have informed the plaintiff verbally of the reference being [15]unfavorable. The plaintiff is currently unemployed after being employed consecutively for over 10 years. Defendant denies slandering the reputation of the plaintiff but circumstantial evidence exits that the "rude and unprofessional" behavior being stated is from their writing. See attachment R). *Resume and probation letter*

---

[13]/To permit an employer to retaliate against a charging party based on its unilateral determination that the charge was unreasonable or otherwise unjustified would chill the rights of all individuals protected by the anti-discrimination statutes. An individual is protected against retaliation for participation in employment discrimination proceedings even if those proceedings involved a different entity\28. For example, a violation would be found if a respondent refused to hire the charging party because it was aware that she filed an EEOC charge against her former employer.

[14] A preliminary injunction may be properly issued whenever the questions of law or fact are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss to the opposing party will be trivial if it is granted." Wilms v. Hand (1951) 101 Cal.App.2d 811, 815.

[15] The plaintiff-employee who established defamation *per se* is entitled to presumed damages without any specific proof of injuries. Defamation *per se* "requires that the words used are in and of themselves so obviously and naturally harmful that proof of special damages is unnecessary. Fried v Jacobson, 99 Ill.

The plaintiff's appearance for orientation at the H.R. location was on November 2, 2006. Did her African American appearance result in these complaints on rendering a write up on the only available day, Friday, November 3, 2006, from the same departments that she visited during her orientation? It is a fact that the orientation included each department that alleged the complaints. It is a fact that each department failed to support the plaintiff, was this retaliation because of negligence.

Plaintiff has direct evidence that H. R. Director and Executive director assisted the plaintiff with her internal complaint engaging " [16]opposing activity" on November 2, 2006. See memo with Executive director (handwritten edits) and Human Resources Director. See attachment (A) *Cmorfit letter dated Nov. 2 and probation letter dated Nov. 6, 2006.* Immediately thereafter, on November 6, 2006, defendant engaged in defamatory slandering until the present date.

**The defendant lacks the capability to state the dates, identify the staff, and articulate the complaints from four different individuals because the complaints are false and were crafted quickly to retaliate. The plaintiff was not allowed to address the complaints, confirm or discuss with such individuals the subject matter.   The defendant gave no prior verbal warnings before the threat to fire in 30 days if another complaint was confirmed, when the first complaints were never confirmed and came after the plaintiff made her own three internal complaints, the last one on November 2, 2006.  This is a direct form of retaliation, based on the sheer fact that the probation and should have been made before she entered into opposition protection. The probation notice came after complaint on November 6, 2006. Plaintiff mentioned the retaliation in her resignation letter several times and when she discussed her complaint at the EEOC.**

Plaintiff has direct evidence that two white predecessor experienced the same negligence to install PeopleSoft on personal computers from the Technical Support from the ACE location to the HED location. However, the difference in treatment is that the white staff when complained were promoted and transferred, but the African American staff complaining was put on probation with 30 day probation. This is blatant unfair treatment. **Technical Support staff are responsible for installing programs on employees computers. If the installation is not done by technical support then they are negligent. Plaintiff installed program due to lack of support from technical support, not because she wanted the program, but because she needed it to do her job!**

EEOC Manual:  **Plaintiff requests "Relief"**

---

[16] Opposition includes making internal complaints of unlawful practices, the opposition will be protected if the employee actually believes in good faith that the practice is unlawful and a reasonable person would believe the practice is unlawful. There are many examples of cases in which an employee complained about an alleged discrimination that turned out not to exist, but then the employer retaliated against the employee for making the complaint. The employee can win on retaliation claim even though she loses on the underlying discrimination claim.

The Court of Appeals for this Circuit has held that, while the limited equitable relief of a retraction may be available in defamation actions, "the usual rule is that equity does not enjoin libel or slander and that the only remedy for defamation is an action for <u>damages."</u> *Community for Creative Non-Violence v. Pierce, 814 F.*

The plaintiff begs the U.S. District Court of D.C. to adhere enforcement provisions under Section 2000e-5-706 F(3)(4)5) to  immediately grant the injunctive relief for Defamation and Retaliation.  Where a plaintiff complaint seeks money damages, a preliminary injunction is appropriate.  The defendants Statement of Financial Position is well endowed to permit the damages for relief to the plaintiff. ( Attach F)

To instruct the defendant to "cease and remit" from slandering the reputation of the plaintiff by defaming her character into informing potential employers that she is "rude and unprofessional" to grant relief on informing of "EEOC" charge and to cease from falsely stating that plaintiff was "fired."   In addition to granting the damages outlined under violations in Title VII, Statute 42 U.S.C. 1981 (b).  The American Council on Education employs over 200 staff members.

**Front Pay:**  Yearly salary of $49,999.99 at $27.44 per hour before constructive discharge.  The American Council on Education has successfully ruined the reputation of the 52 year old African American ex-employee and reinstatement is not option, although plaintiff is interested in continuing work at ACE.  However, there is no guarantee that plaintiff could enjoy work until retirement based on complaint being public record.  Potential employers could refuse to hire employee that filed civil complaint.  Therefore, front pay is considered a relief based on:

> This Second Circuit decision, upholding more than 20 years of front pay, is particularly distressing, not only because of the duration, but because of its presumption that victims of discrimination are otherwise unemployable, and that it is the employer's burden to show otherwise if it wants to avoid massive front pay awards

> On June 4, 2001, the Supreme Court of the United States resolved the issue and held that front pay is not subject to the statutory caps of § 1981a. In the unanimous opinion, the Supreme Court noted that, in the abstract, front pay certainly could be considered compensation for future pecuniary losses. Yet, Justice Thomas, the author of the Court's opinion, believed that the better interpretation of § 1981a is that front pay is not capped. Justice Thomas stressed that courts around the nation have historically viewed front pay as equitable relief authorized under § 706 which is appropriate where reinstatement is not possible. Further, Congress made clear that the compensatory and punitive damages which were added in 1991 were in addition to other relief already authorized by § 706.

> Under Title VII, the court is authorized "to order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). The district court awarded Williams one year's

8

worth of front pay as a substitute for reinstatement, which was unavailable because a subsequent merger had eliminated the opthalmic division in which Williams had worked.

**Cobra Penalties:** **$134,000.00.  Plaintiff was not mailed the COBRA notice, the form has the incorrect address and the defendant did nothing to ensure that it was received.  Husband  neither son received notice.**

**Plaintiff has mentioned lack of health benefits since May 10, 2007, and now the defendant produces the form a year later.  Penalties are due to be assessed by the law.  The plaintiff resigned and never received COBRA notice.  Defendant has no proof that it was received.  (Attachment C)**

**TIAA-CREF retirement fund:**  **$27.000.00.**  Plaintiff has depleted entire retirement fund to afford lifestyle and pay son's college tuition.  Plaintiff was without husband's income for 8 months due to separation.

**Back pay**:  49,999.00 less earning of $16, 660.00  last year after suffering from defamation of reputation and career by the American Council on Education

**Punitive and Compensatory damages**:  Based on 211 staff members employed at the American Council on Education.

Sincerely,

Jacqueline T. Robinson-Reeder

2140 Brooks Drive, #421

District Heights, MD  20747

**YOUR STATEMENT**

.... you for choosing Adventist HealthCare for your healthcare services. **The balance shown is your responsibility and is due no later than 10 days from the date of this statement.** Please pay your balance in full or contact a customer service representative for payment arrangements at the appropriate telephone numbers listed on the back of this statement.

*ATTAC#(1)*

## ► SUMMARY OF CHARGES

| | |
|---|---|
| BLOOD | 30.51 |
| CARDIAC CATH LAB | 803.27 |
| SUPPLIES | 574.31 |
| PHARMACY | 2.24 |
| | |
| **Total Charges** | 1410.33 |

## ► INSURANCE INFORMATION

**PRIMARY**
Insurance Name                 SELF - PAY
Name of Insured                JACQUELINE ROBINSO
Policy Number

## ► QUESTIONS

Billing questions or an itemized bill request? Call your Customer Service representative at (301) 315-3660. Mon-Thurs 9:00am to 4:30pm, Friday 9:00am to 4:00pm. See back for more information.

## ► ACCOUNT SUMMARY

| | |
|---|---|
| Statement date | 12/13/2007 |
| Date of Service | 12/07/07 |
| Account Number | 11676558 |
| Insurance Payments | $.00 |
| Contractual Adjustments | $.00 |
| Patient Payments | $.00 |

| This is your balance | $1410.33 |
|---|---|

---

PLEASE RETAIN THIS PORTION FOR YOUR RECORDS

**PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT**

☐ Check box if below address is incorrect and indicate change(s) on reverse side.


**Adventist HealthCare**

WASHINGTON ADVENTIST HOSPITAL
PO BOX 62121
BALTIMORE, MD 21264-2121

RETURN SERVICE REQUESTED

**PATIENT NAME:**  ROBINSONREEDER ,JACQUELI    34621
Please write your account number on your check.
Make check payable to Adventist HealthCare.

34621*T900MB9GU000421



0101

| **IF PAYING BY MASTERCARD, DISCOVER, VISA OR AMERICAN EXPRESS, FILL OUT BELOW.** |
|---|
| CHECK CARD USING FOR PAYMENT |

☐ MASTERCARD   ☐ DISCOVER   ☐ VISA   ☐ AMERICAN EXPRESS

CARD NUMBER                          SIGNATURE CODE

SIGNATURE                            EXP. DATE

| DUE DATE | STATEMENT DATE | ACCT. # |
|---|---|---|
| 12/23/2007 | 12/13/07 | 11676558 OUT |

| AMOUNT DUE | SHOW AMOUNT PAID HERE |
|---|---|
| $1410.33 | $ |

652752C

JACQUELINE ROBINSONREEDER
2140 BROOKS DRIVE #421
SUITE 300
DISTRICT HEIGHTS, MD 20747-1067

WASHINGTON ADVENTIST HOSPITAL
PO BOX 62121
BALTIMORE, MD 21264-2121

Doctors Community Hospital
P.O. Box 630824
Baltimore, MD 21263-0824
301-552-8092

| AMOUNT ENCLOSED | TYPE |
|---|---|
| | FINAL |

PAGE 1

| PATIENT NAME | PATIENT ACCOUNT NO. | ADMISSION DATE | DISCHARGE DATE | BILLING DATE |
|---|---|---|---|---|
| ROBINSON-REEDER,JACQUELINE | V00000996486 | 12/06/07 | 12/07/07 | 12/11/07 |

| GUARANTOR | INSURANCE COVERAGE | POLICY NUMBER |
|---|---|---|
| ROBINSON-REEDER,JACQUELINE 2140 BROOKS DRIVE #421 DISTRICT HEIGHTS   MD     20747 *20747* | | |

**PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT**

| DESCRIPTION | QTY | AMOUNT |
|---|---|---|
| SEMI PRIVATE ROOM AND BOARD | 1 | 1120.00 |
| ADMISSION CHARGE | 1 | 130.00 |
| PHARMACY | 5 | 5.36 |
| MED SUR SUPPLIES | 2 | 137.85 |
| LABORATORY | 1 | 13.85 |
| CHEMISTRY | 8 | 155.15 |
| HEMATOLOGY | 3 | 36.05 |
| DX XRAY | 1 | 55.55 |
| EMERGENCY MEDICAL SCREENING | 1 | 50.00 |
| ER BEYOND EMTALA | 1 | 343.00 |
| EKG ECG | 1 | 14.60 |

**This statement is for informational purposes only. Please review the insurance information at the top of this statement. If the information is incorrect, please contact the Business Office by calling (301-552-8093). An itemized bill is available upon request.**

ACCOUNT NUMBER   V00000996486

| | |
|---|---|
| TOTAL | 2061.41 |
| TOTAL CREDITS | 0.00 |
| TOTAL DUE | 2061.41 |
| ESTIMATED INSURANCE COVERAGE | 0.00 |

FFSUMBILL.PCL - 040607    **RETAIN THIS PORTION FOR YOUR RECORDS**    **(THIS IS NOT A BILL)**    2061.41



**CAPITOL CARDIOLOGY ASSOCIATES**
8100 GOOD LUCK ROAD
SUITE #302
LANHAM, MD 20706-3504

31380

**RETURN SERVICE REQUESTED**

BALANCE FORWARD:
LAST PAYMENT AMOUNT:  0.00
LAST PAYMENT DATE:
POSTING DATES: FROM 12/14/2005 TO 12/14/2007
BILLING INQUIRIES, CALL: (301) 552-1270 * FAX:(301) 552-1202
MONDAY THRU THURSDAY 9AM-4PM

| IF PAYING BY MASTERCARD OR VISA, FILL OUT BELOW. |
|---|
| CHECK CARD USING FOR PAYMENT |
| ☐ MASTERCARD    ☐ VISA |
| CARD NUMBER    (ATTACH)    SIGNATURE CODE |
| SIGNATURE    EXP. DATE |

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 12/14/2007 | $6365.00 | 1-115350.0 |

**PAGE: 1 of 1**

| SHOW AMOUNT PAID HERE | $ |
|---|---|

200002A

JACQUELINE T. ROBINSON-REEDER
2140 BROOKS DR.
#421
DISTRICT HEIGHTS, MD 20747-1034

CAPITOL CARDIOLOGY ASSOCIATES
8100 GOOD LUCK ROAD
SUITE #302
LANHAM, MD 20706-3504

31380*T910NKNIH000899

☐ Please check box if address is incorrect or insurance
☐ information has changed, and indicate change(s) on reverse side.

**STATEMENT**    PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

| SERVICE DATE | PATIENT | PROC. CODE | DESCRIPTION | PROVIDER | AMOUNT |
|---|---|---|---|---|---|
| | | | | | 0.00 |
| 12/05/2007 | JACQUELINE | 78465 | SPECT/STRESS (THALLIUM/CARDIOLI | KO, THOMAS Y | 1300.00 |
| 12/05/2007 | JACQUELINE | 93015 | CARD-VASC STRESS TEST, SUPERV, | KO, THOMAS Y | 400.00 |
| 12/05/2007 | JACQUELINE | 78478 | MYOCARDIAL PERFUSION & WALL MOT | KO, THOMAS Y | 240.00 |
| 12/05/2007 | JACQUELINE | 78480 | MYOCARDIAL PERFUSION & EJECTION | KO, THOMAS Y | 245.00 |
| 12/05/2007 | JACQUELINE | A9500 | CARDIOLITE/SESTAMIBI--PER DOSE | KO, THOMAS Y | 320.00 |
| 12/05/2007 | JACQUELINE | A4216 | STERILE WATER/SALINE, 10 ML | KO, THOMAS Y | 10.00 |
| | | | | *PATIENT RESPONSIBILITY-->* | 2515.00 |
| 12/07/2007 | JACQUELINE | PWAHO | PWAHO-WAH-OUTPAT | Proc, Ashai | 0.00 |
| 12/07/2007 | JACQUELINE | 9351026 | CATH, LEFT HEART, PERCUTANEOUS- | Proc, Ashai | 1800.00 |
| 12/07/2007 | JACQUELINE | 93543 | CATH, INJ PROCEDURE LT VENT | Proc, Ashai | 350.00 |
| 12/07/2007 | JACQUELINE | 93545 | INJ PROCEDURE FOR SELECTV COR A | Proc, Ashai | 500.00 |
| 12/07/2007 | JACQUELINE | 9355626, | IMAGING SUPER, I&R PULM ANGIOG,E | Proc, Ashai | 800.00 |
| 12/07/2007 | JACQUELINE | 9355526, | IMAGING SUPER, I&R VENTRIC ANGI | Proc, Ashai | 400.00 |
| | | | | *PATIENT RESPONSIBILITY-->* | 3850.00 |

| | CURRENT | 31-60 | 61-90 | OVER 90 | TOTAL | ACCOUNT BALANCE |
|---|---|---|---|---|---|---|
| **PATIENT AGING** | 6365.00 | 0.00 | 0.00 | 0.00 | 6365.00 | ▶▶▶▶▶▶  **$6365.00** |
| **INSURANCE AGING** | | | | | | **DUE FROM PATIENT** |
| **TOTAL AGING** | | | | | | ▶▶▶▶▶▶  **$6365.00** |

**DUE DATE: 12/29/2007**

**MESSAGES:**
THIS IS YOUR MONTHLY STATEMENT.  CALL THE OFFICE WITH ANY QUESTIONS.  THANK YOU.    CAPITOL
CARDIOLOGY ASSOCIATES  (301) 552-1270

# Southern Maryland Hospital

## 7503 Surratts Road
## Clinton, MD 20735
### (301) 868-8000
**www.SMHCHealth.org**

**Person Responsible for Bill:**

**Patient:**

JACQUELINE ROBINSON
2140 BROOKS DR #421
FORESTVILLE,MD 20747

ROBINSON JACQUELINE
Account Number: 1624876
Admission Date: 10/06/07
Discharge Date: 10/06/07
Billing Date  : 10/14/07

———————————— This is for Informational Purposes Only ————————————
** THIS IS NOT A BILL **

Dear JACQUELINE ROBINSON

This is a summary of charges for the services provided during the visit for the above
named patient.  For your convenience, it has been summarized by major service area.
An itemized bill is available upon request.

| SERVICE DESCRIPTION | CHARGES |
|---|---|
| Pharmacy | 13.39 |
| * Pathology/Laboratory | 8.86 |
| * Radiology/X-Ray | 128.77 |
| * Emergency Room Services | 529.20 |
| Total | 680.22 |

* Your insurance company may be billed separately by physicians or professional
groups for reading and interpreting the service(s) identified above.  Please see the
listing for those billing services on the reverse/back of this letter.

Our records indicate that the following insurance(s) may be responsible for a portion
or all of these charges.  Please advise us of any discrepancies.

   Insurance 1:  SYMETRA LIFE INS COMPANY      ID #: 28352 8496

Charges may be added to your account as a result of services provided before dis-
charge but billed after completion of test results and physician interpretation.

If you have any questions regarding this summary bill or need additional information,
please call our billing office at (301) 877-4262 between 9:00 AM and 4:00 PM.

   >>>  PLEASE KEEP THIS SUMMARY OF CHARGES FOR FUTURE REFERENCE  <<<


View and Search our Consumer Health Information Portal!  Your Complete Guide to
Being Well and Staying Healthy..visit us at:  **www.SMHCHealth.org**



# SOUTHERN MARYLAND
## HOSPITAL CENTER
**7503 Surratts Road ❖ Clinton, Maryland 20735**
**(301) 868-8000**

*Main Hospital*
**(301) 868-8000**

*Emergency Dept.*
**(301) 877-4500**



### EXITCARE® PATIENT INFORMATION
Patient Name: Jacqueline Robinson
Attending Healthcare Provider: SANDRA BANKS, MD

# Headache

Headaches are caused by many different problems. **Most commonly, headache is caused by muscle tension from an injury, fatigue or emotional upset.** Excessive muscle contractions in the scalp and neck result in a headache that often feels like a tight band around the head. Tension headaches often have areas of tenderness over the scalp and the back of the neck. These headaches may last for days or longer, and some build up into migraines.

**Migraines usually cause a throbbing headache, which is made worse by activity.** Sometimes only one side of the head hurts. Nausea, vomiting and sinus pain or stuffiness are common with migraines. Visual symptoms such as light sensitivity, blind spots, or flashing lights may also occur. Loud noises may worsen migraine headaches. Many factors may cause migraine headaches:
➢ Emotional stress, lack of sleep, and menstrual periods
➢ Alcohol and some drugs (such as birth control pills)
➢ Diet factors (fasting, caffeine, food preservatives, chocolate)
➢ Environmental factors (weather changes, bright lights, odors, smoke)

Other causes of headaches include minor injuries to the head. Arthritis in the neck, problems with the jaw, eyes, ears, or nose are also causes of headaches. Allergies, drugs, alcohol, and exposure to smoke can also cause moderate headaches. Rebound headaches can occur from excessive use of pain medications.
**Nervous system infections, brain tumors, strokes and other blood vessel problems can all cause bad headaches. These are rare.**

Treatment of headaches includes medicines for pain and relaxation. Ice packs or heat applied to the back of the head and neck help some people. Massaging the shoulders, neck and scalp are often very useful. Relaxation techniques and stretching can help prevent these headaches. Avoid alcohol and cigarette smoking as these tend to make headaches worse. Please see your caregiver if your headache isn't better in 2 days.

## SEEK IMMEDIATE MEDICAL CARE IF:
➢ You develop a high fever, chills, or repeated vomiting
➢ You Pass out or have difficulty with vision
➢ You develop unusual numbness or weakness of your arms or legs
➢ You develop severe pain despite medication
➢ You develop confusion, or neck stiffness
➢ You have a worsening of a headache or do not obtain relief

FOLLOW-UP INSTRUCTIONS

EXHIBIT (E) G W
Proof of Professional
Character

ATTACH (A)

October 12, 2007

TO WHOM IT MAY CONCERN:

I am writing this letter on behalf of Mrs. Jackie Robinson-Reeder.  Jackie, as we all called her, worked with me for two months this summer at The George Washington University Graduate School of Education and Human Development, as my Special Assistant when my secretary decided to return to her home state of Connecticut.  As the Dean of the School, I needed someone who could quickly adapt to the role of Special Assistant which is a very demanding, high-profile position.  Jackie did just that.  Although she had no prior affiliation with the University, Jackie quickly adapted to the position fulfilling her responsibilities in a very professional, effective and efficient manner.  She quickly learned the organizational structure of the Dean's Office, was always well organized, and worked exceptionally well with the staff in the School and other branches of the University. A number of her responsibilities involved personnel matters, which she fulfilled in a highly professional, confidential manner.  Prior to her departure, I was impressed with how Jackie worked with my new assistant to make sure she was well prepared for the transition.  Equally impressive was the number of faculty and staff who stopped by to thank her the last few days she worked with us.

My assessment of Jackie is that she is personable, but professional manner she demonstrated  in fulfilling her roles and responsibilities as my assistant is the way she would fulfill any position that she assumes.  As a result, I am more than pleased to write this letter of support and to serve as a reference for her.  Please do not hesitate to contact me at ███████████ you have any questions or need further comments.

Respectfully,


Graduate School of Education
        And Human Development
The George Washington University

*ATTACH ②*

From:

"Carpenter, Sheila" <SJC@jordenusa.com>

[Add to Address Book]

To:

<julia.judish@pillsburylaw.com>

Subject:

Robinson-Reeder v. ACE

Date:

Monday, November 26, 2007 6:42:24 PM

[View Source]

Good afternoon - I have been appointed by the Court to represent Ms. Robinson-Reeder for purposes of the upcoming mediation. You should have received a copy of my appearance from the Court earlier today. I am writing to see if we can obtain agreement in advance of the mediation that ACE will give out only objective information when asked for references on Ms. Robinson-Reeder. She has reason to believe that someone at ACE is giving her a bad reference. Thank you.

*ATTACH 2)*

From:

"Carpenter, Sheila" <SJC@jordenusa.com>

[Add to Address Book]

To:

<georgia28@comcast.net>

Subject:

PB - Robinson-Reeder v ACE

Date:

Monday, November 26, 2007 4:30:57 PM

[View Source]

Please review the attached document.   This is what I'd suggest is a neutral reference.
Let me know if you want to change anything.

*before Mediation ATTACH(2)*

November 26, 2007

*This was denied*

To Whom It May Concern:

Jacqueline T. Robinson-Reeder was employed by the American Council on Education as the Executive Assistant in the Higher Education for Development office.  She started in June 2006 as an agency temporary employee and was hired by ACE as a permanent employee on September 7, 2006. She was the assistant to the Executive Director and also served as the office manager.  Her annual salary was $49,999.93.  She resigned on November 6, 2006.

*Paycheck*

*ATTACH B*

(GW)

| For Internal Use Only | |
|---|---|
| 1102  M | MADC |

Refer all employment verifications for loans, leases, mortgages and the like to:
**THE WORK NUMBER FOR EVERYONE**
To obtain salary key call 1-800-367-2884 or go to www.theworknumber.com
Company Code = 10571; At prompt provide: SS#, and PIN#
Give verifier salary key and number to call: 1-800-367-5690
For additional assistance, please call customer service at 1-800-998-7566

JACQUELINE ROBINSON-REEDER
421
2140 BROOKS DRIVE
DISTRICT HEIGHTS MD 20747

SSN:  XXX-XX-8496

Check #:  0482232
Pay Date:  31 Aug 2007
Pay Period:  20 Aug 2007  to  26 Aug 2007

Net Pay:  $278.23

| Tax Data | Federal | State |
|---|---|---|
| Marital Status: | S | S |
| Allowances: | 2 | 2 |
| Addl. Amt: | 0.00 | 0.00 |

## EARNINGS/REIMBURSEMENTS

| CLIENT SITE | DESCRIPTION | TAXABLE | RATE | HOURS | CURRENT |
|---|---|---|---|---|---|
| GEORGE WASHINGT | REGULAR WA | Y | 12.00 | 28.00 | 336.00 |
| TOT CURR GROSS | | | | | 336.00 |

## TAX WITHHOLDINGS

| DESCRIPTION | CURRENT | YTD |
|---|---|---|
| FEDERAL | 15.96 | 1195.42 |
| FICA OASDI | 20.83 | 849.59 |
| FICA MED | 4.87 | 198.69 |
| MARYLAND | 16.11 | 817.21 |
| TOTAL WITHHOLDINGS | 57.77 | 3060.91 |

I will notify CORESTAFF that I am available for continued employment no later than the next business day after an assignment ends and at least once every week thereafter, to be kept on a current available list. Failure to do so may be considered a voluntary quit and may result in a loss of unemployment benefits.

## DEDUCTIONS

| DESCRIPTION | PRETAX | CURRENT | YTD |
|---|---|---|---|
| TOTAL DEDUCTIONS | | | |

## NET PAY DISTRIBUTION

| | TAXABLE GROSS BEFORE PTD | NON-TAXABLE GROSS | GROSS CHECK | FED WH | FICA WH | OTHER TAX WH | DEDUCTIONS | NET CHECK |
|---|---|---|---|---|---|---|---|---|
| CURRENT | 336.00 | | 336.00 | 15.96 | 25.70 | 16.11 | | 278.23 |
| YTD | 13703.07 | | 13703.07 | 1195.42 | 1048.28 | 817.21 | | 10642.16 |

| 278.23 | Direct Deposit to | Acct# XXXXX6908 | Trnst# 051000101 |
|---|---|---|---|

| | TOTAL: | ******$278.23 |
|---|---|---|

JACQUELINE ROBINSON-REEDER
**421**
**2140 BROOKS DRIVE**
**DISTRICT HEIGHTS MD 20747**

*ATTACH B*

**American Council on Education**
# 1 Dupont Circle NW
Washington, DC 20036

| Pay Group: | SEM-Semi-Monthly Pay Group | Business Unit: | ACE |
|---|---|---|---|
| Pay Begin Date: | 10/08/2006 | Advice #: | 0530442 |
| Pay End Date: | 10/22/2006 | Advice Date: | 10/30/2006 |

Jacqueline T. Robinson-Reeder
2140 Brooks Drive
Apt. #421
Forestville, MD 20747

| Employee ID: | 5318 |
|---|---|
| Department: | 5660-Higher Education Development |
| Location: | Corporate Headquarters |
| Job Title: | Administrative Level II |
| Pay Rate: | $2,083.33 Semimonthly |

| TAX DATA: | Federal | MD State |
|---|---|---|
| Marital Status: | Single | n/a |
| Allowances: | 2 | 2 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

### HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular Pay | | | 1,891.02 | 252.00 | 7,211.52 |
| Vacation | 27.472527 | 7.00 | 192.31 | 7.00 | 192.31 |
| Sick | | | 0.00 | 7.00 | 192.31 |
| **Total:** | | 7.00 | 2,083.33 | | 7,596.14 |

### TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 243.84 | 902.35 |
| Fed MED/EE | 27.77 | 105.27 |
| Fed OASDI/EE | 118.74 | 450.11 |
| MD Withholdng | 129.73 | 487.05 |
| **Total:** | 520.08 | 1,944.78 |

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| PPO Medical | 135.50 | 271.00 |
| METLIFE DENTAL | 26.91 | 53.82 |
| Vision | 9.50 | 19.00 |
| **Total:** | 171.91 | 343.82 |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| **Total:** | 0.00 | 0.00 |

### EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| EE Medical | 254.50 | 509.00 |
| METLIFE DENTAL | 20.61 | 41.22 |
| Life & AD/D | 7.69 | 15.38 |
| Life & AD/D* | 2.88 | 5.76 |
| Dependent Life | 0.56 | 1.12 |
| Dependent Life* | 0.88 | 1.76 |

* Taxable

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 2,083.33 | 1,915.18 | 520.08 | 171.91 | 1,391.34 |
| YTD: | 7,596.14 | 7,259.84 | 1,944.78 | 343.82 | 5,307.54 |

### VACATION HOURS

| | YTD |
|---|---|
| Start Balance: | 0.0 |
| + Earned: | 23.3 |
| + Bought: | |
| - Taken: | 7.0 |
| - Sold: | |
| + Adjustments: | 2.2- |
| End Balance: | 14.1 |

### SICK HOURS

| | YTD |
|---|---|
| Start Balance: | 0.0 |
| + Earned: | 17.5 |
| + Bought: | |
| - Taken: | 7.0 |
| - Sold: | |
| + Adjustments: | 1.7- |
| End Balance: | 8.8 |

### NET PAY DISTRIBUTION

| Advice #0530442 | 1,391.34 |
|---|---|
| **Total:** | 1,391.34 |

MESSAGE: Reminder: You are allowed to carryover no more than 30 days annual leave and 180 days sick leave!

Control Number
**D530442**

---

# AMERICAN COUNCIL ON EDUCATION
## One Dupont Circle, NW
## Washington, DC 20036-1193

Date
10/30/2006

Deposit Amount: **$1,391.34**

THIS IS NOT A CHECK DIRECT DEPOSIT ADVICE ONLY

### DIRECT DEPOSIT DISTRIBUTION

| Account Type | Account Number | Deposit Amount |
|---|---|---|
| Checking | 1010113234121 | $1,391.34 |
| **Total:** | | $1,391.34 |

To The
Account(s) Of

**JACQUELINE T. ROBINSON-REEDER**
2140 Brooks Drive
Apt. #421
Forestville, MD 20747

# NON-NEGOTIABLE

| CO. | FILE | DEPT. | CLOCK | NUMBER | 052 |
|-----|------|-------|-------|--------|-----|
| UBP | 010014 | 021275 | | 0070241838 | 1 |

# Earnings Statement



NATIONAL LEAGUE OF CITIES SERVICES
1301 PENNSYLVANIA AVENUE N.W.
SUITE 550
WASHINGTON, DC 20004

Period Ending:     01/06/2006
Pay Date:          01/13/2006

*ATTACH B*

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:      2
MD:           2 Prince George's Cnty

JACQUELINE ROBINSON
2140 BROOKS DR 421
FORESTVILLE MD 20747

Social Security Number: XXX-XX-8496

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 24.3083 | 45.00 | 1,093.87 | 1,093.87 |
| Holiday | 24.3083 | 15.00 | 364.62 | 364.62 |
| Sick | 24.3083 | 7.50 | 182.31 | 182.31 |
| Vacation | 24.3083 | 7.50 | 182.31 | 182.31 |
| **Gross Pay** | | | **$1,823.11** | 1,823.11 |

| Other Benefits and Information | this period | total to date |
|--------------------------------|-------------|---------------|
| 401(K) Er | 182.31 | 182.31 |
| Ytd Lve Taken | | 7.50 |
| Ytd Sick Taken | | 7.50 |
| Leave Balance | | 38.12 |
| Sick Balalnce | | 13.76 |

| Deductions | | | |
|------------|--|--|--|
| **Statutory** | | | |
| Federal Income Tax | -226.50 | 226.50 | |
| Social Security Tax | -109.96 | 109.96 | |
| Medicare Tax | -25.72 | 25.72 | |
| MD State Income Tax | -120.20 | 120.20 | |
| **Other** | | | |
| Dental | -3.45* | 3.45 | |
| Medical | -39.92* | 39.92 | |
| Optional Life | -11.30 | 11.30 | |
| Vision | -6.23* | 6.23 | |
| **Net Pay** | | **$1,270.03** | |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,773.51

COPY     COPY

© 2000 ADP, Inc.

**webs**
web enabled benefit services

DOES Home | Unemployment I...

You are logged in as
**JACQUELINE T ROBINSON
REEDER**
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

## Claimant Profile

Benefit Year End:
Weekly Benefit Amo...
Available Balance:

File Claims

Payment History

View Appeals

1099 Data

Direct Deposit

My Profile

Contact Us

### Profile Information

| Mailing Address | 2140 BROOKS DRIVE APT 421 |
|---|---|
| State | MD |
| City | DISTRICT HEIGHT |
| Zip | 20747 |
| Zip Ext. | 1034 |
| Address Change Date | 2/9/2007 |
| Telephone Number | (301) 967-1570 |
| Cell Phone Number | (000) 000-0000 |
| Email Address | |
| Password | 2744ROBI |

### Benefit Information

| Benefit Year Begin Date | 12/17/2006 |
|---|---|
| Benefit Year End Date | 12/15/2007 |
| Claim Status | BENEFITS EXHAUSTED |
| Maximum Benefit Amount | $9,334.00 |
| Total Paid Amount | $9,334.00 |
| Balance | $0.00 |
| Interview Schedule Date | |
| Interview Schedule Time | |
| Eligibility Review Date | |
| Eligibility Review Time | |

### Reopened Claims Filed

Edit



ON POINT
TECHNOLOGY, INC.

ATTACH
(F)

## STATEMENT OF FINANCIAL POSITION

**SEPTEMBER 30, 2006**

### ASSETS

| | |
|---|---:|
| Cash and cash equivalents | $11,678,267 |
| Receivables (note 3) | 9,955,738 |
| Inventories | 14,113,678 |
| Investments (note 4) | 16,327,228 |
| Other assets | 177,134 |
| Property, net (note 5) | 8,520,066 |
| **TOTAL ASSETS** | **$60,772,111** |

### LIABILITIES AND NET ASSETS
LIABILITIES:

| | |
|---|---:|
| Accounts payable and accrued expenses | $6,761,108 |
| Deferred revenue (note 7) | 7,598,639 |
| Funds held in trust | 291,103 |
| Interest rate swap (note 8) | 211,682 |
| Bonds payable (note 8) | 5,219,176 |
| Postretirement benefit obligation (note 9) | 2,989,252 |
| Total liabilities | $23,070,960 |

COMMITMENTS AND CONTINGENCIES (notes 11 and 12)

NET ASSETS:

| | |
|---|---:|
| Unrestricted | 35,985,145 |
| Temporarily restricted (note 10) | 1,716,006 |
| Total net assets | 37,701,151 |
| **TOTAL LIABILITIES AND NET ASSETS** | **$ 60,772,111** |

*See accompanying notes to financial statements.*

*ATTACH (G) (F)*

*email for Jacqueline for Binese?*

**citi**

Open an Account    Find Citi Locations    Search    Help    Contact Us

Welcome georgia28@comcas...
You have 0 messages

**My Home**    Account Info    Payments    Transfers    Investments    Service C

# My Home

Last visit: 01/13/2008 04:34 PM EST

customize thi

**Did you know**...A federal rule—Regulation D—limits the number of certain types of transactions that can be made from a savings or money market account to six each statement period. Learn more.

## account summary ?

Edi

| | On Deposit | Available Now |
|---|---|---|
| **Checking**<br>Interest Checking XXXXXXX999 | $ 22.95 | $ 22.95 |
| **Savings**<br>Ultimate Money Account XXXXXXX027 | $ 332.73 | $ 332.73 |

**❝ThankYou❞**    View or redeem your ThankYou® Points at thankyou.com. ☺▶

statements | banking alerts | download activity | link an account

**payment & transfer center**

**future payments**

None

**future transfers**

None

**payments:**
express | one-time | recurring | change or cancel

**transfers to linked accounts:**
one-time | recurring | change or cancel

## market watch

Edi



| | As of 01/11/2008 - 00:00 ET | |
|---|---|---|
| Dow Jones 30 Industrials | 12,606.30 | -246.79 |
| NASDAQ Composite | 2,439.94 | -48.58 |
| S&P 500 | 1,401.02 | -19.31 |

©BigCharts.com
As of Close on 1/11/2008

**Quote Finder**

**Website**
www.tiaa-cref.org

**Automated 24-Hour
Information**
800 842-2252

**Personal Assistance**
800 842-2776
M-F, 8am-10pm ET
Sat., 9am-6pm ET

*July 1, 2007 - September 30, 2007*

**TIAA CREF**

FINANCIAL SERVICES    FOR THE GREATER GO
730 Third Avenue, New York, NY 10017-3206

1814/ 5/MBTC02

*ATTAc #(1)*

JACQUELINE T ROBINSON
2140 BROOKS DR # 421
FORESTVILLE MD 20747-1034

*to interess*
*0, 2806.70*

## portfolio summary

| | | this quarter | | this year |
|---|---|---|---|---|
| Beginning value as of: | (06/30/07) | $24,268.11 | (12/31/06) | $32,674.88 |
| Changes during the period: | | | | |
| Contributions | | 0.00 | | 0.00 |
| Distributions & rollovers | | -17,013.41 | | -27,013.41 |
| Net investment gain/loss | | 295.31 | | 1,776.13 |
| TIAA interest | | 59.37 | | 171.78 |
| Ending value: | | $7,609.38 | | $7,609.38 |

**total value as of 09/30/07:    $7,609.38** *

Investing for retirement usually means experiencing both market upswings and downturns.
Diversification across asset classes and funds may help reduce volatility over time. We invite you to
visit www.TIAA-CREF.org/tools for tools to help you create a portfolio to match your investment
objective. Diversification is a technique to help reduce risk, but is not a guarantee against loss.

*Dec 28.07*
*Requested remarks to provide income due to*
*employment*

1814SOS

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JACQUELINE T. ROBINSON-REEDER | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| | ) |
| AMERICAN COUNCIL ON EDUCATION | ) |
| | ) |
| **Defendant** | ) |
| | ) |

CLERK
US DISTRICT & BANKRUPTCY
COURTS

2008 JAN 15 PM 4: 27

Civil Case: 07-0880 (JDB)

RECEIVED

## Declaration of Jacqueline T. Robinson-Reeder

I, Jacqueline T. Robinson-Reeder states as follows:

1.) That I have applied for jobs and was granted an interview with the George Washington University Biostatics Center, the Omni Sheraton Hotel, United Colors of Benetton, The World Bank, The International Finance Corporation, TIAA-CREF, and The Ford Agency. Plaintiff has applied online to over 50 potential employers and denied employment.

2.) That I was denied employment based on direct verbal conversation with staff employees at the George Washington University and the Ford Agency that unfavorable job references from the American Council on Education had been given and the job would not be offered.

3.) That plaintiff made the short list and spoke with Vice-President at the World Bank who was interested in hiring but later refused to speak or hire plaintiff after checking reference with the American Council on Education.

3.) That I was directly advised from the staff adviser of the EEOC to remove the American Council on Education work history from resume to prevent retaliation by receiving negative job references.

4.) That the above mentioned employers were highly interested in hiring the plaintiff, but advised that after completing the reference check process they chose to not offer the position that I qualified for.

5.) That plaintiff did not receive notification that I was eligible to elect benefits under COBRA. Plaintiff had received retirement fund to allow for expenses and paying for medical would have been an option if the ability had been known.

6.) That plaintiff and those of concern has been denied a 'standard job reference in writing" in over five different occasions of request and pleading to improve the standards of living by earning income through employment. Plaintiff has the direct evidence of denial in writing.

7.) That plaintiff has direct written evidence that the American Council on Education informed potential employers that she filed an "EEOC" charge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 15, 2008

Jacqueline T. Robinson-Reeder

**Jacqueline Robinson-Reeder**

*EXHBIT II*

From:    "TIAA-CREF Human Resources" <Careers@tiaa-cref.org>
To:      "Jacqueline Robinson-Reeder" <georgia28@comcast.net>
Sent:    Monday, February 05, 2007 8:00 PM
Attach:  current_email_in_html.html
Subject: [SPAM] Administrative Assistant-1681797 at TIAA

☒

February 5, 2007

Dear Jacqueline Robinson-Reeder:

We have received your resume for the position of Administrative Assistant-1681797 and are currently reviewing your experience and qualifications.

A preliminary review of your candidate profile indicates that you may meet the pre-selection criteria for this position. However, the following information may be missing:

U.S. Equal Employment Opportunity/Affirmative Action Information
Plain Text Resume
Plain Text Cover Letter
Additional Information
To consult your candidate profile and check for any missing information, click here.

To learn more about TIAA, please visit us at www.tiaa-cref.org.

Sincerely,
TIAA Talent Acquisition Department

Replies to this message are undeliverable and will not reach the Human Resources Department. Please do not reply.

*I rec'd several Home phone calls from H.R. Representative. She informed me of her need in Job references from Ac*

*Later, about 2 weeks after when I called her she was not interested and asked me not to call her again.*

*I declare this is a true & honest statement*

*Jacquelin Robinson-Reeder*

7/3/2007

EXHIBIT II

## Jacqueline Robinson-Reeder

**From:** "Emily Rogers" <erogers@omnihotels.com>
**To:** "Jacqueline Robinson-Reeder" <georgia28@comcast.net>
**Sent:** Tuesday, April 24, 2007 3:58 PM
**Subject:** [SPAM] RE: [SPAM] Omni Hotels

Lets do tomorrow at 12:30. What number would you like for me to call?

Emily Rogers
Omni Shoreham Hotel
Recruiter

2500 Calvert Street
Washington DC 20008

---

*I spoke w/ Ms Roger several times and she was very impressed with my skills and experience. After calling ACE for references, I never heard back from never. She refused my calls.*

**From:** Jacqueline Robinson-Reeder [mailto:georgia28@comcast.net]
**Sent:** Tuesday, April 24, 2007 3:41 PM
**To:** Emily Rogers
**Subject:** Re: [SPAM] Omni Hotels

Hello Emily,

Thanks for considering my application. I am available during 12:00 - 1:30 pm., any day of the week.

Jacqueline
301-996-0630 - Cell
301-967-1570 - Home

*I declare this is a true statement,*

*Jacqueline Robinson-Reeder*

---

> ----- Original Message -----
> **From:** Emily Rogers
> **To:** georgia28@comcast.net
> **Sent:** Monday, April 23, 2007 11:08 AM
> **Subject:** [SPAM] Omni Hotels
>
> Jacqueline-
>
> I have received your resume for the Executive Assistant position at the Omni Shoreham Hotel and would like to discuss the opportunity with you further. Please email me times this week that you would be available for a phone interview. Thank you.
>
> Emily Rogers
> Omni Shoreham Hotel
> Recruiter
>
> 2500 Calvert Street
> Washington DC 20008

7/3/2007



**NRI** NRI Accounting Resources
NRI Technology Solutions
NRI Staffing Resources
NRI Legal Resources
NRI HealthCare

# EMPLOYMENT REFERENCE

**From:** Chrystal Hall

| | | | |
|---|---|---|---|
| **Candidate** Jacqueline Robinson-Reeder | | **Date** August 30, 2006 | |
| **Company Contacted** National League of Cities | | **Phone #** 202-626-3000 | |
| **Person Contacted** Chris Becker | | **Title** Deputy Executive Director | |

What was your relationship to this person? Supervised on occassions.    For How Long? 4 months.

When did he/she work for your company? (Month/Year)    From 9/92    To 5/06

Do you have the authority to verify salary?  Yes ✓    No _____    Earnings Were $ 47,880/yr

Based on their resume, it looks like this person did the following (fill in specifics), would you say this is accurate and is there anything else they did that we've missed?

> Jacqueline has worked for National League of Cities (NLC) for quite some time. However, I supervised Jacqueline intermittently on occassions when there where vacancies in the Policy and Federal Regulation departments. Her main responsibility at those times were mostly production of reports and letters that needed to go out to members of Congress.

On the average, how often would you say this person was late or missed work?

> Jacqueline was very reliable and didn't take advantage of the leave policy. Whenever I needed her to pitch in in other departments, she made herself readily available.

What would you say were his/her strengths?

> She has solid computer skills, she's a speed typist, pays attention to detail, thorough, takes her work seriously and strives for perfection.

What area(s) would you say he/she needs to further develop?

> Again, she mainly did production work for me at the times when I needed her. She did an excellent job, her work product was top-notched.

Do you know why he/she left your company?  Is he/she eligible for rehire in their previous position?

> Jacqueline has been with NLC for a very long time, we never talked about her reason for wanting to leave. I can only assume that she was ready for a change. She is definitely eligible for rehire.



Employment Reference – Page 2

Can you discuss their ability to prioritize work and their overall organizational skills?

To the extent that I was involved, Jacqueline knew how to organize and prioritize her desk. She knew how to manage her time quite well and she also knew what was important and what could wait. She is a very efficient worker.

How well did this person take initiative and/or show self-motivation in work situations?

She showed initiative and self-motivation quite well. She was always willing to pitch in and take responsibility of what needed to be done, not only in her department, but other departments as well.

Would you say this candidate was team oriented or did he/she work alone? What type of environment would he/she be most suited?

Jacqueline is a team player and works well independently if given clear direction.

Our candidate says they are technically proficient in the following areas (fill in details), would you say that is accurate? How often and in what capacity did they use these skills?

We used Microsoft office suite and she is skilled in all areas, especially Word and Publisher.

I am considering presenting him/her for a position where (most difficult aspect or most important aspect of job). How do you think this person would fit in this type of position?

I believe Jacqueline will do just fine wherever she goes. She gets along well with all levels of staff, is a team player, hard worker and has a good work ethic.

Compared to others in this position, how does this person rank?

Because I've only supervised her for a short period of time, I can't honestly and fairly rank her compared to others. She did a great job for me when I needed her and I couldn't ask for anything more.

What skill or quality does this candidate have that would cause them to stand out over other candidates?

Her thoroughness, attention to detail and willingness to roll her sleeves up to jump in and help out all departments at a moments notice.

Occasionally, our clients will also check references before or after an offer of employment has been extended. Would you have any concerns if they contacted you directly?

I don't have any issues with that.

*If there is any other information you may want to add that may help us help this candidate, please let me leave my name, email address and number*



NRI Accounting Resources
NRI Technology Solutions
NRI Staffing Resources
NRI Legal Resources
NRI HealthCare

# EMPLOYMENT REFERENCE

**From:** Chrystal Hall

**Candidate** Jacqueline Robinson-Reeder
**Company Contacted** National League of Cities
**Person Contacted** Clifford Johnson

**Date** June 14, 2006
**Phone #** 202-626-3013
**Title** Executive Director

What was your relationship to this person? She was a member of my staff.    For How Long? About 4 yrs.

When did he/she work for your company? (Month/Year)    From _____    To _____

Do you have the authority to verify salary?    Yes _____    No _____    Earnings Were $__

Based on their resume, it looks like this person did the following (fill in specifics), would you say this is accurate and is there anything else they did that we've missed?

> Jacqueline was the administrative assistant and provided a broad range of administrative and clerical duties. Alot of meeting planning, hotel arrangements, logistics for on-site events, scheduling, database management,

On the average, how often would you say this person was late or missed work?

> She was rarely late or missed work. She is very reliable in that respect. Her leave was always planned.

What would you say were his/her strengths?

> She has strong word processing skills, database adminstration, provides exceptional customer service. We often received compliments on how well she handled the members of the National League.

What area(s) would you say he/she needs to further develop?

> Her biggest challenge was working for multiple people. She would be great working one on one. However, dealing with 3 to 4 people simultaneously was a bit confusing for her.

Do you know why he/she left your company?    Is he/she eligible for rehire in their previous position?

> She just resigned. She was here for a very long time. I guess she was interested in doing something different.

November 28, 2007

**Jacqueline T. Robinson-Reeder**
**Salary History – November 7, 2006 to Present**
**Core Staff – TeleSec**

Unemployed from November 7, 2006 - January 26, 2007.

Plaintiff registered with over five (5) employment agencies by completing typing, spelling, PowerPoint, Microsoft Word and Excel tests to seek employment. Her tests scores were in the 92% percentile, but due to receiving negative job references from the American Council on Education, the plaintiff was not referred to job openings and refused the ability to earn an income.

During her despair in seeking employment, the plaintiff contacted TeleSec employment agency. She had established an excellent working relationship with TeleSec, which resulted in her permanent employment with the National League of Cities in August of 1992.

The companies listed below had contracts with TeleSec and she was selected to work on a Temp-to-Hire basis. Unfortunately, when job references were needed to gain permanent employment, the American Council on Education maliciously and intentionally informed potential employers that the plaintiff was "fired" for unprofessional and rude behavior.

## TEMP-TO- HIRE POSITIONS HELD BY JACQUELINE T. ROBINSON-REEDER

### George Washington University – Executive Assistant
1-26-07 to 2-11-07
$16.50 per hour
Duties: Scheduled inter-office meetings for two professors, assisting with coordinating and meeting planning.

### World Bank – Program Assistant
4-2-07 to 8-3-07
$17.31 per hour
Duties: Obtain executive signatures on approvals of international documents, answer phones, and assist with meeting planning and organized filing system.

### George Washington University – Special Assistant
8-2-07 to 10-7-07
$16.50 per hour
Duties: Schedule meetings for the Dean of Education and Human Development, coordinate meetings, assist students with signature for school documents, organize and copy confidential reports. Served as assistant to the Dean's staff.

Taxable gross YTD: $16,572.57

EXHIBIT C

January 9, 2006

To:        Ms. Coleen Collins
           ACE, Human Resources

From:      Jacqueline T. Robinson-Reeder

Subject:   Employee reference letter

I have been trying to secure a job referral from Christine Morfit. I have left telephone messages, sent e-mail's and have asked temporary agencies to call for references so that I can find employment. All of the requests have been ignored. Therefore, I have been denied employment since November 7, 2006, because there is no reference letter from my prior employer to be obtained.

My performance at HED was productive and there was no problem stated in my letter regarding my job performance other than false and exaggerated verbal accusations. I can find no reason for my employer to behave in this manner to ruin my career and financial well-being because I complained and chose to resign from an intolerable working environment which was documented and started to occur since the employment of LaTisha Wadlington in HED.

After writing my resignation letter on November 6, 2006, to be effective on November 27, 2006, I was asked to remove my personal belongings immediately from HED on November 6, 2006, instead. Due to the short notice of this demand, my husband could not pick me up in the car to hold my boxes. He was working in Bowie, so I had to call my minister. I was devastated and none of this made any sense to me. I could not carry my boxes while walking to the subway station.

Under the circumstances, which seemed like I was being fired, I handled the situation very well and remained professional and dedicated. I volunteered to stay with Christine to assist her with completing the staff's purchase orders, organize my work area for my replacement and show her where the office key's and files were, etc., I stayed until 7:00 p.m. working to organize and prepare the office.

At the end of the day, on November 6, 2006, we did a walk-thru of the office area and I thanked Christine for hiring me. We embraced after working so well together, and she promised to write a reference letter for me, which has been ignored to date, January 9, 2007.

I believe that ACE can find a better way to handle this situation appropriately and with respect towards an employee that resigned.

Best regards, Jackie:}

*ATTACH B*

March 12, 2007

Mr. Robert Mulberger
President/CEO
NRI Employment Agency
Washington, D.C.

Dear Mr. Mulberger:

I believe that your agency has treated me unfairly due to my inability to work under unhealthy conditions at the American Council on Education in the Higher Education Office for Development. I was assigned a temporary position at HED through your employment agency in June of 2006. I was hired permanently in September 2006. You received your fee for my hire and unfortunately, my position withstood many complications after my hiring. I never received orientation, was left to install technical equipment alone and was forced to supervise the H.R. associate's immature relative. The working conditions at HED became intolerable daily while I struggled to maintain my job.

My work performance was excellent and my position in assisting the Executive Director was well received. However, when I complained about the insubordination of the office assistant that I supervised, I received no assistance from Human Resources or management. The outcome was an inappropriate probation with a threat of being fired approximately one day after the H.R. Associate screamed at me in the front office while employees witnessed her behavior. I found it necessary to resign from this position immediately to keep my untarnished reputation intact and to find employment with a healthier environment.

I contacted Crystal Hall the day I received the probation letter on November 6, 2006, to make sure that NRI had received their fees and after doing so, informed her that I found it necessary to resign from my job. I should be rewarded for my loyalty to NRI to ensure that your fees were received before resigning from my assignment.

Ms. Hall said she would assist me in finding another position, but played games of ignoring my calls, for a month until I had no choice but to register with another employment agency to find a job. I later determined that ACE was giving references that I was fired instead of my resignation. I am struggling to find employment while receiving no empathy for the pain I endured to keep my job.

I cannot believe that NRI would treat an employee in this manner. When I needed your agency most, you turned your back on me. I have had no choice but to file a complaint to report this behavior to the Equal Employment Agency Commission, The Federal Trade Commission, Bureau of Consumer Protection and the Better Business Bureau.

I have visited your webpage and witnessed many positions that I qualify for. NRI has advertised positions for Executive Assistants in the Washington Post every Sunday. Donna, the account manager told me to call Crystal Hall daily to beg for assignments, while she continues to ignore my calls.

The bottom line is that NRI has refused to assist me in finding another position for discriminatory reasons. I don't deserve to be treated like this when I represented NRI in a professional manner until my day of unemployment.

Sincerely,

Jacqueline T. Robinson-Reeder

## Jacqueline Robinson-Reeder

| | |
|---|---|
| **From:** | "Mulberger, Robb" <mulberger@nri-staffing.com> |
| **To:** | "Jacqueline Robinson-Reeder" <georgia28@comcast.net> |
| **Sent:** | Monday, March 12, 2007 12:40 PM |
| **Subject:** | [SPAM] RE: NRI Temporary Employee – Complaint |

Ms Robinson-Reeder –

Thank you for your email and accompanying letter.

I will look into this matter immediately...and get back to you soon. I am traveling the latter part of the week... so it might not be until early next week until I am able to respond.

Again – thank you for drawing this to my attention.

Robb Mulberger

---

**From:** Jacqueline Robinson-Reeder [mailto:georgia28@comcast.net]
**Sent:** Monday, March 12, 2007 12:26 AM
**To:** Mulberger, Robb
**Subject:** NRI Temporary Employee – Complaint

March 12, 2007

Hello Mr. Mulberger,

I have attached a letter for your review. I hope you find time to read it. Your input to your staff is important to teach them how to handle difficult situations for employees.

Thank you so much,
Jacqueline T. Robinson-Reeder

AO 240 (Rev. 10/03)

# UNITED STATES DISTRICT COURT

District of  COLUMBIA

Jacqueline T. Robinson - Reed

Plaintiff

V.

American Council on Education

Defendant

RECEIVED

**APPLICATION TO PROCEED
WITHOUT PREPAYMENT OF
FEES AND AFFIDAVIT**

CASE NUMBER: 07 -0880 (JDB)

I, Jacqueline T. Robinson-Reeder declare that I am the (check appropriate box)

☒ petitioner/plaintiff/movant          ☐ other

in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs under 28 USC §1915 I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the complaint/petition/motion.

In support of this application, I answer the following questions under penalty of perjury:

1. Are you currently incarcerated?          ☐ Yes          ☒ No          (If "No," go to Part 2)

   If "Yes," state the place of your incarceration _____

   Are you employed at the institution? _____ Do you receive any payment from the institution? _____

   Attach a ledger sheet from the institution(s) of your incarceration showing at least the past **six** months' transactions.

2. Are you currently employed?          ☒ Yes          ☐ No

   a. If the answer is "Yes," state the amount of your take-home salary or wages and pay period and give the name and address of your employer.  (List both gross and net salary.)

      Started  1/30/08      $16/hour

   b. If the answer is "No," state the date of your last employment, the amount of your take-home salary or wages and pay period and the name and address of your last employer.

3. In the past 12 twelve months have you received any money from any of the following sources?

   | | | |
   |---|---|---|
   | a. Business, profession or other self-employment | ☐ Yes | ☒ No |
   | b. Rent payments, interest or dividends | ☐ Yes | ☒ No |
   | c. Pensions, annuities or life insurance payments | ☐ Yes | ☒ No |
   | d. Disability or workers compensation payments | ☐ Yes | ☒ No |
   | e. Gifts or inheritances | ☐ Yes | ☒ No |
   | f. Any other sources | ☒ Yes | ☐ No |

   $300 in food stamps - stopping 2/12/08 (one time)

If the answer to any of the above is "Yes," describe, on the following page, each source of money and state the amount received and what you expect you will continue to receive.

AO 240 Reverse (Rev. 10/03)

4.  Do you have **any** cash or checking or savings accounts?    ☑ Yes        ☐ No

    *savings – $30*
    If "Yes," state the total amount. *checking – $5*

5.  Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or any other thing of value?    ☐ Yes    ☑ No

    If "Yes," describe the property and state its value.

6.  List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.  (If children are dependents, please refer to them by their initials)

    *Jarrell Humphries (21) – student*

I declare under penalty of perjury that the above information is true and correct.

*Feb 9 2009* _____    _Jacqueline F. Robinson-Reeder_ _____
        Date                                    Signature of Applicant

**NOTICE TO PRISONER:** A Prisoner seeking to proceed without prepayment of fees shall submit an affidavit stating all assets.  In addition, a prisoner must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.